Jory Strizich

AO #2138747

Montana State Prison

700 Conley Lake Rd.

Deer Lodge, MT 59722

Plaintiff Pro se

**RECEIVED**

FEB 12 2016

CLERK, U.S. DISTRICT COURT
DISTRICT OF MONTANA
HELENA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

| | |
|---|---|
| JORY STRIZICH | |
|    Plaintiff, | |
| | |
| VS. | COMPLAINT |
| | Civil Action No. _____ |
| | |
| MIKE BATISTA ; LEROY | |
| KIRKEGARD; LEONARD | |
| MIHELICH; TOM WOODS; | |
| MYRON BEESON; TOM | |
| WILSON; DAN HESS; | |
| LORNA KUCHINSKY; BILLIE | |
| REICH; KRISTY COBBAN. | |
|    Defendants. | |

1.

## I. JURISDICTION AND VENUE

1. This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. Section 1331 and 1343 (a)(3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure. Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. Section 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2. The District of Montana, Helena Division is an appropriate venue under 28 U.S.C. Section 1391 (b)(2) because it is where the events giving rise to this claim occurred.

## II. PLAINTIFF

3. Plaintiff, Jory Strizich, is and was at

2.

all times mentioned herein a prisoner of
the State of Montana in the custody of
the Montana Department of Corrections.
He is currently confined in Montana State
Prison, in Deer Lodge, Montana.

III. DEFENDANTS

4. Defendant, Mike Batista is the Director
of the state of Montana Department of
Corrections. He is legally responsible for
the overall operation of the Department
and each institution under its
jurisdiction, including Montana State
Prison.

5. Defendant, Leroy Kirkegard is the Warden
of Montana State Prison. He is legally
responsible for the operation of Montana
State Prison and for the welfare of all
the inmates in that prison.

6. Defendant, Leonard Mihelich is a
Correctional Officer of the Montana

3.

Department of Corrections who, at all times mentioned in this complaint, held the rank of Associate Warden of Operations and was assigned to Montana State Prison.

7. Defendant, Tom Woods is a Correctional Officer of the Montana Department of Corrections who, at all times mentioned in this complaint, held the rank of Associate Warden of Security and was assigned to Montana State Prison.

8. Defendant, Myron Beeson is a Correctional Officer of the Montana Department of Corrections who, at all times mentioned in this complaint, held the rank of Associate Warden of Housing and was assigned to Montana State Prison.

9. Defendant, Tom Wilson is a Correctional Officer of the Montana Department of Corrections who, at all times mentioned in this complaint, held the rank of Associate Warden of Programs and was

assigned to Montana State Prison.

10. Defendant, Dan Hess is a Correctional Officer of the Montana Department of Corrections who, at all times mentioned in this complaint, held the rank of Security Threat Group Coordinator and was assigned to Montana State Prison.

11. Defendant, Lorna Kuchinsky is a Correctional Officer of the Montana Department of Corrections who, at all times mentioned in this complaint, held the rank of Security Threat Group Analyst and was assigned to Montana State Prison.

12. Defendant, Billie Reich is a Correctional Officer of the Montana Department of Corrections who, at all times mentioned in this complaint, held the rank of Grievance Coordinator and was assigned to Montana State Prison.

13. Defendant, Kristy Cobban is a Correctional

5.

Officer of the Montana Department of Corrections who, at all times mentioned in this complaint, held the rank of Grievance Coordinator and was assigned to Montana State Prison.

14. Each defendant is sued individually and in his or her official capacity. At all times mentioned in this complaint each defendant acted under the color of state law.

IV. FACTS

15. On September 18, 2007, plaintiff arrived at Montana State Prison (MSP) with a five (5) year sentence to the Montana Department of Corrections (MDOC) for two (2) counts of felony assault on a peace officer.

16. On or about September 19, 2007, defendant Dan Hess interviewed plaintiff and validated plaintiff as a member of

the Security Threat Group (STG) known
as Northerners/Norteños.

17. On or about November of 2007, plaintiff
was classified by the MSP Administrative
Review Committee (ARC) to Close Custody
and placed in Close Unit-1 (CU-1) with
active and aggressive Southerner/Sureño
gang members. The Southerners/Sureños
are the archenemies of the Northerners/
Norteños.

18. In October of 2008, MSP experienced a
major disturbance in the gym on the
High Security Compound between the
Northerners and their allied Crips and the
Southerners and their allied White
Supremacists. This disturbance involved
20 or more gang members attacking one
another with weapons and odd numbers,
including the assault of several
correctional officers who attempted to
intervene to stop the attacks.

19. On or about October 30, 2008, plaintiff was reclassified to Restricted Administrative Segregation (RAS) and placed in Maximum Security for gang activity. RAS is the most secure and restricted custody level in all of the state of Montana. Holding only a total capacity of sixteen (16) inmates, RAS houses what the MDOC considers the "worst of the worst."

20. Upon information and belief following the 2008 gym disturbance at MSP there were numerous back and forth incidents where the Northerner gang members attacked Southerner gang members, or vice versa, at MSP and other MDOC contracted facilities, including at the Cascade and Yellowstone County jails and on the streets of Montana.

21. In July of 2009, plaintiff renounced his gang affiliations to his unit manager Robert Shaw and case manager Chris

8.

Cornell.

22. On or about November 12, 2008, plaintiff was reclassified to Administrative Segregation (Ad. Seg.) and released from RAS. Ad. Seg. is one custody level down from RAS.

23. Upon information and belief between December of 2008 and January 10, 2010, inmate Ken Howard, a known Northerner gang member, got into physical altercations with inmates Guadalupe Galicia, a known Southerner gang member, and Chris Daniels, another known Southerner gang member and self-proclaimed shot-caller, in CU-1.

24. On January 16, 2010, another major disturbance occurred at MSP in the High Support building on the High Security Compound between the Northerners and Southerners. This disturbance involved 15 or more gang members brandishing

weapons (makeshift knives, also known as "shanks") and once again attacking each other in odd numbers. (Note: Nobody was stabbed. Once the actual altercation began the Southerner gang members abandoned their weapons; presumably because they hoped to intimidate the Northerners and get them to back down, however failing, the Southerners feared getting more time added to their prison sentences for the possession and use of weapons.).

25. In 2010, Tracy Napier, Professional Development Specialist employed by the MDOC, wrote an article for the Correctional Signpost, 2010, No. 5, beginning on page 8, claiming that gangs and gang activity is becoming more prevalent in Montana, and that MSP is experiencing an increase in violence between the Northerners and their allied Crips and the Southerners and their allied White Supremacists.

10.

26. In February of 2010, plaintiff was reclassified to Maximum Security General Population (Max. Pop.) and placed in Close Unit-3 (CU-3). Max. Pop. is one custody level down from Ad. Seg.

27. On or about February 19, 2010, Defendant Dan Hess interviewed plaintiff regarding his involvement in STG activity. Plaintiff told Hess that he had renounced his gang affiliations and would not get involved in anything. Hess responded: "You never were a Norteño, you're not mexican." Then, "How am I supposed to believe that you dropped out? I need something from you to show good faith. So, what can you tell me about inmate Stacy Hall being a high-ranking member of Nuestra Familia and his activities?" (Note: Nuestra Familia is a highly sophisticated and organized prison gang centrally located and based out of California which manages all Northerners.) Plaintiff stated that he did not know anything about that. Hess then said: "You

know, I can help get you into our bootcamp program, but you have to help me. Now, I have information and know that inmate Hall is a high-ranking Nuestra Familia member here to train the Northerners. What do you know about it?" Plaintiff told Hess that he really did not know anything about that and he was not going to tell him what he wanted to hear just to get himself out of prison faster. Hess then concluded the interview stating to Plaintiff: "Yeah, once a Norteño always a Norteño."

28. Plaintiff believes that it may be relative that prior to the above-mentioned interview with defendant Hess, on or about August of 2008, the bootcamp program (also known as the Treasure State Correctional Training Center (TSCTC)) denied plaintiff's acceptance. Subsequent to the interview, in March of 2010, the bootcamp program once again denied plaintiff's acceptance.

28. On August 12, 2010, plaintiff was transferred to the Transitional Center (prerelease) in Great Falls, MT. (Note: The Transition Center is a privately owned facility contracted with the MDOC to house Montana inmates.)

30. In September of 2010 at MSP in the High-Side chowhall, inmate Cody Flesch, a known Northerner gang member, used a razor blade to slice the faces of inmates Chris Daniels and Levi Daniels, two (2) validated and highly influential Southerner gang members. Rumors then began to circulate around MSP that the Southerners were going to retaliate by taking out a high-ranking Northerner. Several Southerner gang members were placed in locked housing for conspiring to retaliate.

31. On October 6, 2010, plaintiff was transferred back to MSP for walking away from the Transition Center, and placed

in the Martz Diagnostic Intake Unit (MDIU).

32. Upon information and belief on or between the months of October through December of 2010, inmate Mike Daniels, a known Southerner gang member and relative of Chris Daniels and Levi Daniels, directed several Southerner gang members and associates to assault inmate Chris Parmar, a known Northerner gang member, in the High-Side kitchen at MSP. Inmate Mike Daniels was placed in locked housing for his involvement with the assault.

33. On December 14, 2010, plaintiff was transferred to Crossroads Correctional Center (CCC) in Shelby, MT. (Note: CCC is a private prison owned by Corrections Corporation of America contracted with the MDOC to house Montana inmates.)

34. Immediately upon arrival at CCC on F-block plaintiff was approached by

five (5) Southerner gang members and
their associates to verify his Northerner
status. Plaintiff stated he was inactive
and with mutual respect he would not
cause any problems.

35. Upon information and belief prior to
plaintiff's arrival and while in transport
to CCC, CCC correctional officers shuffled
known Southerner gang members around.
When the Southerners asked the officers
why they were being moved around the
officers told them: "A Northerner is
coming in and we have to make room for
him." The Southerners became agitated
by the moves which disrupted their
comfortable housing arrangements. Thus,
creating an atypical and hostile
environment by making plaintiff the
target of the Southerners anger and
frustration.

36. Upon information and belief plaintiff's
brother Jesse LaBelle, who at the time

was an inmate being housed at CCC, was also approached and harassed by the Southerners about the moves taking place because of plaintiff.

37. On December 15, 2010, plaintiff overheard Southerner gang members stating to others that they were going to "get that buster" ('Buster' being a derogatory term Southerners use when referring to Northerners), and "if he thinks it's gonna be one on one he's wrong, we're gonna roll deep and take him out."

38. Plaintiff went to his cell and told two (2) of his friends what he had overheard. Soon thereafter correctional officers came through the housing unit, saw too many inmates in plaintiff's cell and told them to leave, and upon leaving all three (3), plaintiff and his friends, were stared down and "mean-mugged" by the Southerner gang members and

their associates. A physical encounter ensued when a Southerner gang member flinched at plaintiff and plaintiff reacted.

39. On or about January 14, 2011, Plaintiff was reclassified to RAS, transferred back to MSP and placed in Maximum Security.

40. On or about March of 2011 at MSP in Maximum Security - RAS, inmate Kelly Stanfield, a known White Supremacist gang member and Southerner ally, attempted to break the locking device on his shower door while inmate Cody Flesch, a known Northerner gang member, was enroute to his shower. Correctional officers had to tase and cell extract inmate Kelly Stanfield to subdue him before taking him to the hole.

41. While the above-mentioned incident was taking place several Southerner and

White Supremacist gang members were kicking their cell doors and yelling and screaming: "Fuck you busters, we're gonna kill you! You got lucky we missed this time motherfuckers!"

42. On April 5, 2011, plaintiff discharged his five (5) year MDOC sentence and was released from MSP.

43. Upon information and belief on November 15, 2011, Vera Hoscheid, whom at the time was the case manager for CU-1, wrote an incident report about statements another inmate made to her related to a specific threat of danger to inmate Stacy Hall, a known Northerner associate, posed by Southerner gang members being housed in CU-1 on the Close Custody Management Program (CCMP). The incident report was copied to then Warden Mike Mahoney, Deputy Warden Ross Swanson, Associate Warden Leonard Mihelich, Associate Warden Myron Beeson, Security Major

Tom Woods, Unit Manager Michelle Stehy, the Command Post, and the Investigators' Office.

44. Upon information and belief MSP officials strongly dislike inmate Stacy Hall for his past and current legal and political activities. It is believed that prison officials; namely defendant Dan Hess, and others such as Unit Manager Alvin Fode, began to exploit the gossip-ridden culture at MSP to make inmate Stacy Hall a target for STGs by telling other inmates that he was a shot-caller, or leader, for the Northerners.

45. On November 16, 2011, over his expressed concerns, inmate Stacy Hall was transferred to CU-1 and placed on the CCMP. Within seconds upon arrival two (2) Southerner gang members assaulted inmate Stacy Hall with a weapon.

46. Upon information and belief shortly

after the assault against inmate Stacy Hall, correctional officers rewarded the two (2) Southerner gang member assailants with extra food and coffee and told them they "did a good job."

47. In response to the assault against inmate Stacy Hall, a Northerner associate, numerous Southerner gang members and associates were assaulted and forced to "check-in" (go to protective custody) at the Cascade County Detention Center in Great Falls, MT by Northerner gang members and their associates.

48. On or about the end of 2011 or early 2012, inmate Cody Flesch, the Northerner gang member who used a razor blade to slice the faces of two (2) highly influential Southerner gang members named Chris Daniels and Levi Daniels, was in CU-1 on the CCMP taking a shower when inmate Victor Snorsky, a

known Southerner associate, went into the shower area and with a razor blade sliced inmate Cody Flesch across the back, shoulder, chest and face area. A fight ensued and correctional officers had to physically pull the inmates apart.

49. On or about June of 2012, MSP experienced yet another major disturbance, this time outside of the High-Side gym on the walkway to CU-1, between the Northerners and their associates and the Southerners and their associates. This disturbance involved, including associates, approximately five (5) Northerners and twelve (12) Southerners fighting one another. It took numerous correctional officers to restrain the inmates fighting and restore order.

50. In response to the June of 2012 disturbance at MSP numerous Southerner gang members and their associates were

assaulted at the private regional prison in Glendive, MT, the Cascade County Detention Center in Great Falls, MT, and the streets of MT by Northerner gang members and their associates.

51. In April of 2013, plaintiff was returned to MSP on a new five (5) year sentence to the MDOC for felony theft and placed in the MDIU.

52. On May 23, 2013, plaintiff was placed in High Side Unit-1 (HSU-1), formerly named CU-1, which at the time was dominated by active and aggressive Southerner gang members and their associates.

53. On June 18, 2013, at approximately 8:00 p.m., correctional officer Captain McNiel talked to inmate Keith Lori on the tier outside of cellblock upper-A for about twenty (20) minutes.

54. After talking to Captain McNiel inmate Keith Lori came back onto cellblock upper-A and pulled plaintiff aside in front of all the other inmates and informed plaintiff that Captain McNiel had told him that there was intell. that plaintiff had a shank, that there was tension between plaintiff and the Southerners, and that something was supposed to happen between plaintiff and the Southerners. Plaintiff denied ever having a shank or knowledge of any tension to inmate Keith Lori, and attempted to inquire more about the supposed tension and intell. that something was supposed to happen, but inmate Keith Lori claimed that Captain McNiel did not provide exact details.

55. After talking to plaintiff inmate Keith Lori was approached by two (2) White Supremacist gang members and scorned for spending twenty (20) minutes talking to Captain McNiel outside of their

earshot and tipping plaintiff off about
something that was none of his (Keith
Lori's) business.

56. Later that evening the two (2) White
Supremacist gang members assaulted
inmate Keith Lori in the cellblock
upper-A dayroom area. All three (3)
inmates were taken to locked housing.

57. On June 19, 2013, plaintiff went to
the cu-1 unit manager's office to retrieve
a cartridge for a typewriter. Unit
Manager Sam Jovanovich appeared
concerned about something unbeknown
to plaintiff, and asked plaintiff if he
was having any problems with the
Southerners or anyone else. Plaintiff
told Unit Manager Sam Jovanovich that
to his knowledge everything was alright.

58. The information inmate Keith Lori
claimed Captain McNiel provided him
quickly became mutated, twisted and

distorted, and rumors began to circulate among the inmates in CU-1 that plaintiff was carrying a shank and planned to stab a Southerner.

59. Inflaming the situation even more, on June 20, 2013, anywhere between twenty (20) and thirty (30) correctional officers were posted up in the High-Side chowhall during all meals, and at the library, on high alert; a telltale sign that something was going to happen and they knew about it.

60. Sure enough, during the evening meal in the High-Side chowhall a Southerner gang member snuck up behind plaintiff while he was seated at his table, and punched plaintiff in the face and grabbed him and attempted to take him to the ground; presumably because it is where plaintiff would be more vulnerable and the Southerner gang member could do more damage. However,

plaintiff was able to stand himself up out of his seat and push the Southerner gang member away and create distance between them. The correctional officers jumped into action and restrained the Southerner gang member and plaintiff before anything further. Both were taken to locked housing.

61. Upon information and belief about the same time frame as the above-mentioned incident two (2) Southerner gang members assaulted a Northerner gang member at the private regional prison in Great Falls, MT.

62. On or about June 21, 2013, defendant Billie Reich, defendant Dan Hess, and then STG Analyst Tracy Napier, did an interview of plaintiff. They asked plaintiff where the shank he was carrying was at, and he denied ever having one. Plaintiff asked what the assault against him was all about, and defendant Dan

Hess responded that they had intell.
the Southerners were going to make a
move on him, but did not know exactly
which one, and it was not until the
actual event took place that they
figured it out. Plaintiff complained that
if they knew the Southerners were going
to come after him, but did not know
which one it would be, they should have
put the Southerners and/or he in locked
housing to ensure plaintiff's safety and
security while prison officials investigated
the matter, rather than just increasing
security to minimize any damage done to
plaintiff after the fact. Defendant Dan
Hess retorted that if he would have
had us all put in locked housing plaintiff
would be complaining about that instead,
so they were damned either way. Plaintiff
defended saying that at least if they
had locked them up he would not have
been assaulted. Going forward, plaintiff
stated that he was glad it was not any
worse than it was, and that he felt lucky.

27.

Defendant Dan Hess said: "Yeah, it would have been a good hit if he would have stuck you." ('stuck' meaning stabbed.) Plaintiff then expressed that he was trying to stay out of trouble and away from the gangs and gang activity, he was not going to live in a unit dominated by Southerners where he would have to live in constant paranoia, and that it was unreasonable for the prison administration to force him to be housed with his archenemies knowing of the specific and serious threat to his safety. They said they would look at plaintiff's housing options, but he would likely stay on the High Security Compound. Defendant Dan Hess asked plaintiff whether inmate Levi Baker, a Southerner associate, was a Southerner gang member, and Tracy Napier asked plaintiff who was calling shots for the Northerners on the High-Side, to which plaintiff responded that he did not know. They said there was still more investigating to do, so

plaintiff would likely go to Ad. Seg. temporarily, but that someone would be in contact with him again soon. That concluded the interview.

62. Plaintiff was reclassified to temporary Max. Pop. and on July 4, 2013, placed in Locked Housing Unit-2 (LHU-2), formerly named CU-3, pending an investigation into the attack carried out on plaintiff in the chowhall and security concerns.

63. On July 18, 2013, HSU-1 Sergeant John Doe delivered plaintiff's reclass. The HSU-1 Unit Management Team; which is comprised of two (2) unit Sergeants, a Case Manager, and the Unit Manager, noted that plaintiff was cleared of any wrongdoing and that the investigation concluded he was, in fact, assaulted by a rival STG member in the High-Side chowhall, and recommended plaintiff be removed from Max. Pop. and placed

28.

back in HSU-1 at Close Custody. As plaintiff went to sign the reclass. Sergeant John Doe told plaintiff; "We're bringing you back to our unit. You do know the Sureños are going to keep coming after you right? We'll standby and try to minimize any damage when they do." Plaintiff asked why he was being put back in HSU-1 if they knew he was going to continually be attacked? Sergeant John Doe shrugged his shoulders and said; "You chose this path, now you have to live it and deal with the consequences." Plaintiff appealed the reclass. recommendation.

64. Plaintiff filed a grievance, sent a kite to Classification Specialist Roxanne Wigert, and talked to Grievance Coordinator defendant Billie Reich expressing concern regarding what Sergeant John Doe had said to him when serving the reclass. papers.

65. Upon information and belief on or about the middle of July of 2013, inmate Brian Olsen, a known Northerner gang member, was in HSU-1 on the High-Side Management Program (HSMP), formerly named CSMP, in the dayroom for scheduled time out of his cell when inmate Gabriel Zavalla, a known Southerner gang member, snuck up and blindsided inmate Brian Olsen; punching him in the face. Presumably out of self-defense, inmate Brian Olsen responded by pulling out a razor blade and slicing inmate Gabriel Zavalla on the head and face area. The inmates continued to fight until several correctional officers were able to responde and restrain them. Both were taken to locked housing. Correctional officers found and secured a razor blade in the area of the fight and stored it as evidence.

66. On July 30, 2013, the MSP ARC convened and overrode the HSU-1 Unit Management Team's recommendation and reclassed

plaintiff to High-Side Unit-2 (HSU-2),
formerly named CU-2. HSU-2 was
dominated at that time by Northerner
gang members and their allied Crips and
other associates.

67. On or about August 1, 2013, plaintiff
was placed in HSU-2 in a cell with a
validated Northerner gang member.

68. On or about September 15, 2013, plaintiff
was found guilty at a prison disciplinary
hearing of 'conspiracy to attempt to
commit theft' and 'gang activity' (the
gang activity was for tattooing: adding to
and cleaning up a preexisting tattoo
that MSP officials consider to be STG
related), and reclassed to Ad. Seg. and
placed in Locked Housing Unit-1 (LHU-1),
formerly named Maximum Security.

68. On or about January 14, 2014, in
accordance with a locked housing inmate
management plan, plaintiff was transferred

to LHU-2 Max. Pop.

70. On April 9, 2014, plaintiff filed an
informal resolution challenging MSP
officials' policy and practice of housing
rival gang members together knowing of
the serious threat of violence. Plaintiff
requested that MSP officials do an
investigation, stop the practice of
housing rival gang members together, and
quit being deliberately indifferent to
inmate safety. On April 14, 2014, LHU-2
Unit Manager Paul Lucier denied plaintiff's
request stating: "Strizich, you are past
the time limits to submit an informal
grievance on something that you claim
happened on 6/20/13." Apparently Unit
Manager Paul Lucier mistakenly thought
plaintiff was grieving the June 20, 2013,
incident where he was assaulted by a
rival gang member in the High-Side
chowhall, rather than the policy and
practice of housing rival gang members
together.

71. On April 15, 2014, plaintiff filed a formal grievance to the Grievance Coordinator. On May 12, 2014, defendant Kristy Cobban denied plaintiff's request stating: "The classification system accounts for several safety issues or concerns. The current practice/system adequately meets safety needs as it allows for inmates to interact with staff to make safety issues known. Grievance is denied, as there is no evidence of indifference."

72. On May 15, 2014, plaintiff filed a grievance appeal to the Warden. On May 20, 2014, defendant Leonard Mihelich denied plaintiff's request stating: "Inmate Strizich, I agree with the response from the Grievance Coordinator."

73. On May 24, 2014, plaintiff filed a grievance appeal to the Corrections Division. On May 29, 2014, Executive Assistant Jane LaMoure for MDOC

34.

Director defendant Mike Batista denied plaintiff's request stating: " Inmate Strizich: The director has reviewed your grievance. He will grant the investigation but denying separate housing for rival gang members. If you have concerns, you are encouraged to talk with a case manager."

74. On or about October of 2014, LHU-2 Case Manager Irl Lambertson and Unit Manager Paul Lucier talked to plaintiff about his upcoming reclass, transferring him out of locked housing and to the High Security Compound. Plaintiff expressed his concerns for his safety if housed in HSU-1 which was dominated by Southerner gang members and their associates who were reasonably believed to be actively targeting Northerners.

75. On October 16, 2014, plaintiff wrote a memorandum regarding his primary reclassification concerns and sent copies

35.

of it to the LHU-2 Unit Management Team, namely Case Manager Irl Lambertson and Unit Manager Paul Lucier; the ARC; STG Coordinator defendant Dan Hess; STG Analyst defendant Lorna Kuchinsky; Associate Warden of Security defendant Tom Woods; Associate Warden of Housing defendant Myron Beeson; and Warden defendant Leroy Kirkegard. In the memorandum plaintiff specifically expressed concern for his safety by being housed in a unit dominated by rival Southerner gang members and their associates knowing of the serious threat of violence.

76. On October 23, 2014, the LHU-2 Unit Management Team completed plaintiff's reclass. and therein noted: "There is a definite concern that conflicts with other inmates may result in security issues. There is still reason to believe that Strizich has enemies associated with STGs." Regardless, they

recommended plaintiff be placed in HSU-1 which as stated earlier was dominated by rival Southerner gang members and their associates.

77. On October 28, 2014, the MSP ARC convened and approved the LHU-2 Unit Management Team's recommendation and noted that plaintiff be "monitored closely." However, due to inmate Rico Coates, who at the time was in HSU-1, having placed separation needs against plaintiff he was not permitted to be transferred to HSU-1 and was required to remain in LHU-2 until inmate Rico Coates' custody changed and he was moved to another unit.

78. On or about November of 2014, plaintiff met with STG Analyst defendant Lorna Kuchinsky and once again expressed concern for his safety by MSP officials' decision to place him in HSU-1 which was dominated by rival Southerner gang members and

their associates. Defendant Lorna Kuchinsky stated she believed there would not be any problems and that HSU-1 would be the best place for plaintiff. Plaintiff tried again to warn otherwise, but all fell on deaf ears.

79. Before plaintiff had the chance to be transferred to HSU-1 he was accepted into chemical dependency treatment and on January 6, 2015, plaintiff was transferred to the Connections Corrections Program in Warm Springs, MT.

80. Upon information and belief on or about the end of January of 2015, inmate Derrick Martell, a known Northerner gang member, arrived at MSP and was placed in the MDIU. Soon thereafter, STG Coordinator defendant Dan Hess interviewed inmate Derrick Martell inquiring as to his Northerner status. Inmate Derrick Martell told defendant Dan Hess that he was inactive, but had

concern for his safety by being housed
with rival Southerner gang members.
Defendant Dan Hess claimed no one is
active at MSP anymore so he had
nothing to worry about. Inmate Derrick
Martell inquired as to the whereabouts
of plaintiff, to which defendant Dan
Hess responded: "Jory dropped out and
debriefed. He gave me a bundle and
told me all of the Northern education
and structure. He doesn't want anything
to do with it and is doing good now."
Inmate Derrick Martell concluded the
interview by telling defendant Dan Hess
he did not want anything to do with
it either. (Statements about plaintiff were lies.)

81. Upon information and belief on or
about the early morning hours of
February of 2015 in the MDIU, inmate
Justin Becker, a known Southerner gang
member, ran into inmate Derrick Martell's
cell and attacked him. Inmate Derrick
Martell defended himself by punching

39.

inmate Justin Becker back. The inmates
continued to fight until correctional
officers were able to intervene and
restrain them, at which time they were
both taken to locked housing.

82. On February 11, 2015, plaintiff was
terminated from the Connections
Corrections Program in Warm Springs, MT,
for a contract violation.

83. On February 13, 2015, plaintiff was
returned to MSP and placed immediately
in LHU-2 on Pre-Hearing Confinement
pending Classification Decision (PHC-CD).
Plaintiff was met by admissions officer
Sam Casey and defendant Billie Reich,
who told plaintiff the reason he is in
LHU-2 on PHC-CD rather than in the
MDTU, is because the MSP administration
had concerns for plaintiff's safety due
to his gang affiliation; that he would
be a target by the Southerner gang
members.

84. On or about February 26, 2015, plaintiff was reclassed to Max. Pop. and remained in LHU-2.

85. On or about May 20, 2015, plaintiff was reclassed to HSU-1 for placement on the HSMP. However, once again inmate Rico Coates was in HSU-1 and therefore, plaintiff could not be transferred.

86. Due to another inmate named Rodney Dubois having separation needs against plaintiff whom was also in HSU-1, MSP officials decided to transfer plaintiff to HSU-2. On or about June 26, 2015, plaintiff was transferred to HSU-2.

87. HSU-1 and HSU-2 inmates are separated for all mass movements such as chow, yard, gym, and library. However, for work and treatment groups, including school, both units are mixed. On or about September of 2015, plaintiff was enrolled in school.

41.

88. On September 25, 2015, after having gone to HSU-1 from HSU-2 to pick up the other inmate students with teacher Mr. Hannly, plaintiff and the others made their way toward the school. While enroute plaintiff observed another inmate student Ronnie Skunkcap, who had just started that day, talking to inmate Vernon Dutchie, a known Southerner gang member, through the High-Side yard fence. Plaintiff overheard inmate Vernon Dutchie telling inmate Ronnie Skunkcap to "take care of that for me and Reap" (Reap is short for Reaper. Inmate Speaksthunder's alias is Reaper, and is a known Southerner gang member.) to which inmate Ronnie Skunkcap replied: "Don't worry I've got you. I'll take care of it." Class took place without incident.

89. On September 28, 2015, plaintiff was standing outside of HSU-1 with other inmates while teacher Mr. Hannly was

inside HSU-1 to retrieve inmate Ronnie Skunkcap, the Southerner gang member/ associate taking orders from Southerner gang member inmate Vernon Dutchie. Plaintiff was talking to another inmate when out of nowhere plaintiff was blindsided and struck extremely hard on the face, right eye/nose. Plaintiff's glasses cut into his nose and went flying hitting the ground. Plaintiff saw a bright flash for a moment. He did not know how many assailants he had to deal with or whether weapons were involved, etc. Plaintiff was fearful that he was going to be seriously injured or possibly worse. His survival instincts kicked in and he immediately threw two (2) punches at the inmate standing before him (who turned out to be inmate Ronnie Skunkcap) to create distance between them. Plaintiff believed both punches connected to inmate Ronnie Skunkcap's head and dazed him. They seemed to be effective because he took

43.

a couple of steps back and kept his distance. Plaintiff used his peripheral vision and assessed the situation as one (1) assailant and no guards in sight. Other inmates were saying something but plaintiff could not decipher or understand what. Plaintiff focused his full attention on inmate Ronnie Skunkcap, who had his hands up as if he was going to strike. Plaintiff kept his hands up to block any attempts. There was a minute standoff with neither inmate making any offensive moves. Finally Plaintiff inside leg kicked inmate Ronnie Skunkcap in an attempt to get him to the ground where plaintiff could pin him down until officers arrived, but he was able to keep his footing and stay standing. Plaintiff heard HSU-1 Unit Manager Sam Jovanovich yell to stop fighting and the officers closed in. Inmate Ronnie Skunkcap began acting more aggressive and brave once officers arrived like he was going to try to strike plaintiff

44.

again, so plaintiff kept his hands up in a defensive posture. Plaintiff told inmate Ronnie Skunkcap "stop the officers are right here." However, inmate Ronnie Skunkcap would not stop advancing until Unit Manager Sam Jovanovich physically restrained him. Once he was restrained plaintiff put his hands down and allowed correctional officer Dan Johnson to place him in handcuffs. Plaintiff was taken and seen by medical who glued a laceration on his nose shut and cleaned the blood off his face. A correctional officer took pictures of plaintiff's injuries, and then plaintiff was taken to LHU-1 and placed in the hole with a major write-up for 'fighting' and 'refusing to follow a direct order.'

80. Plaintiff suffered a laceration and permanent scarring to the side of his nose, a swollen nose which ached and he could not breath through for four (4) days,

45.

a black eye, severe headaches for two (2) months after the incident, and mental and emotional post-traumatic stress; including anxiety, depression, paranoia, fear, and a strong distrust and weariness of others.

91. An investigation was conducted and it was concluded that plaintiff was assaulted by inmate Ronnie Skunkcap, a known Southerner gang member/associate, and that although plaintiff fought back the force he used was reasonable and justified. Plaintiff was cleared of any wrong doing and returned to his previous custody and placed back in HSU-2.

92. The fact remains that plaintiff was assaulted by another inmate who is a Southerner gang member/associate as a result of defendants' policy and practice of mixing rival gang members together.

46.

V. LEGAL CLAIMS

93. Plaintiff realleges and incorporates by reference paragraphs 1-92.

94. Defendants Mike Batista, Leroy Kirkegard, Leonard Mihelich, Tom Woods, Myron Beeson, Tom Wilson, Dan Hess, Lorna Kuchinsky, Billie Reich, and Kristy Cobban did fail to protect plaintiff by failing to separate plaintiff from rival Southerner gang members and their associates knowing of the serious threat of violence without reasonable or legitimate penological purpose or goal in violation of plaintiff Jory Strizich's rights and constituting cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

95. Defendants Mike Batista, Leroy Kirkegard, Leonard Mihelich, Tom Woods, Myron Beeson, Tom Wilson, Dan Hess,

Lorna Kuchinsky, Billie Reich, and Kristy Cobban knew or should have known that failure to protect plaintiff by failing to separate plaintiff from rival Southerner gang members and their associates knowing of the serious threat of violence without reasonable or legitimate penological purpose or goal would violate plaintiff Jory Strizich's rights and constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

96. Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless this court grants the declaratory and injunctive relief which plaintiff seeks.

VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES

97. Plaintiff used the inmate grievance procedure available at MSP to try and solve the problem and has fully exhausted his administrative remedies.

VII. PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays that this court enter judgment granting plaintiff:

98. A declaration that the acts and omissions described herein violated plaintiff's rights under the Constitution and laws of the United States.

99. A preliminary and permanent injunction ordering defendants to segregate plaintiff and other known and documented gang members and associates who could be in danger from rivals who are under the care and custody or supervision of the MDOC, including all private, county and state facilities in which plaintiff and

other Montana State prisoners are held, confined and incarcerated, and that such segregation to be from rival gang members and not from the general prison population.

100. Compensatory damages in excess of $10,000.00 against each defendant, jointly and severally.

101. Punitive damages in excess of $50,000.00 against each defendant.

102. The right to amend complaint should it become necessary.

103. A jury trial on all issues triable by jury.

104. Plaintiff's costs in this suit.

105. Any additional relief this court deems just, proper, and equitable.

Signed and dated this 14th day of
_____January_____, 2016.

_____JRSt_____

Jery Strizich
AO#2138747
Montana State Prison
700 Conley Lake Rd.
Deer Lodge, MT 59722


VERIFICATION


I have read the foregoing complaint and
hereby verify that the matters alleged
therein are true, except as to matters
alleged on information and belief, and, as
to those, I believe them to be true.

I file this complaint in good faith
that I am entitled by law to the relief
sought herein.

I certify under penalty of perjury that
the foregoing is true and correct.


51.

Executed at Deer Lodge, MT, on this
14th day of _____ January _____, 2016.

_____
Tory R. Strizich